# IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

GARY and ANNA-MARIE CUPPELS
individually and on behalf of others
similarly situated,

           Plaintiffs,

    v.

MOUNTAIRE CORPORATION,
MOUNTAIRE FARMS INC., and
MOUNTAIRE FARMS OF
DELAWARE, INC.,

           Defendants.

C.A. NO.: S18C-06-009 CAK

Submitted: June 5, 2020
Decided: June 18, 2020

Upon Defendant Mountaire Corporation's Motion to Dismiss for Lack of Personal
Jurisdiction under Superior Court Civil Rule 12(b)(2)

**DENIED**

## MEMORANDUM OPINION AND ORDER

Chase T. Brockstedt, Esq. and Stephen A. Spence, Esq., Baird Mandalas Brockstedt,
LLC, 1413 Savannah Road, Suite 1, Lewes, DE 19958, Attorneys for Plaintiffs

Philip C. Federico, Esq. and Brent P. Ceryes, Esq., Schochor, Federico and Staton, P.A.,
1211 St. Paul Street Baltimore, MD 21202, Admitted *Pro Hac Vice*, Attorneys for
Plaintiffs

John C. Phillips, Jr., Esq. and Lisa C. McLaughlin, Esq., Phillips, McLaughlin & Hall, 1200 North Broom Street, Wilmington, DE 19806, Attorneys for Defendants

F. Michael Parkowski, Esq., Michael W. Teichman, Esq. and Elio Battista, Jr., Esq., Parkowski, Guerke & Swayze, P.A., 1105 North Market Street, 19th Floor, Wilmington, DE 19801, Attorneys for Defendants

James R. Wedeking, Esquire, Sidley Austin LLP, 1501 K Street, N.W., Washington, DC 20005, Admitted *Pro Hac Vice*, Attorneys for Defendants

**KARSNITZ, J.**

This case provides an object lesson on how a motion for dismissal for lack of personal jurisdiction can languish in a procedural morass for years because of unnecessary discovery delays. As our Supreme Court has said, "[d]iscovery abuse has no place in our courts, and the protection of litigants, the public, and the bar demands nothing less than that our trial courts be diligent in promptly and effectively taking corrective action to 'secure the just, speedy and inexpensive determination of *every* proceeding' before them."[1] Although this case may be a complex case in a number of ways (e.g., number of parties, claims, witnesses and amount of evidence), the motion itself is relatively straightforward. If the facts which were ultimately elicited through jurisdictional discovery had been produced in a timely fashion, this motion could have been disposed of months ago, freeing the parties to focus on the merits of the case, saving significant legal fees and court costs, and conserving judicial resources. On May 8, 2020, I denied Plaintiffs' Motion for A Rule to Show Cause and Discovery Sanctions against Defendants.[2] However, as I said at oral argument that day:

> The cumulative effect of how the defendants have defended the case has slowed it down considerably. I agree with the comment from the plaintiffs today that one of the reasons this case schedule is ambitious is because the defendants have made it so. I will not countenance that in the future. If this kind of discovery problem arises again, I will take a different view of it than I am here today. I intend to closely monitor the case to ensure it moves along appropriately.[3]

---

[1] *Holt v. Holt*, 472 A.2d 820, 824 (Del. 1984) (quoting Del. Super. Ct. Civ. R. 1).

[2] D.I. 375. ("D.I." shall refer to Docket Index Numbers.)

[3] *Id.*, at 62 – 63.

Towards that end, I will finally dispose of the issue of personal jurisdiction today.

## PROCEDURAL HISTORY OF THE MOTION

On June 13, 2018, Plaintiffs filed a putative class action complaint (the "Complaint") against Mountaire Corporation, an Arkansas corporation ("MC"), Mountaire Farms Inc., a Delaware corporation ("MFI") and Mountaire Farms of Delaware, Inc., a Delaware corporation ("MFODI") (individually, a "Defendant," and collectively, "Defendants"). On July 20, 2018, Defendants filed, *inter alia*, a Motion to Dismiss pursuant to Rule 12(b)(2) of the Superior Court Rules of Civil Procedure for lack of personal jurisdiction over MC. On August 24, 2018, Defendants filed an Opening Brief in Support of this Motion. On October 11, 2018, Plaintiffs filed an Answering Brief in opposition to this Motion, and on October 12, 2018, Plaintiffs filed an Amended Complaint. On October 26, 2018, Defendants filed a Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(2) for lack of personal jurisdiction over MC (the "Motion"). On November 16, 2018, Defendants filed an Opening Brief in support of the Motion. On December 7, 2018, Plaintiffs filed an Answering Brief in opposition to the Motion. On December 21, 2018, Defendants filed a Reply Brief in support of the Motion.

In an Order dated August 22, 2018 and clarified on November 7, 2018, this Court stayed discovery in this case, pending disposition of, *inter alia*, the Motion. On February 22, 2019, the Court reopened discovery for the limited purpose of deciding whether MC has sufficient contacts with Delaware to permit the Court to exercise personal jurisdiction

over it. Plaintiffs were given until August 20, 2019 to plead with particularity how this Court might exercise personal jurisdiction over MC. After correspondence to the Court by counsel for the parties on May 1, 2019 and May 3, 2019, on May 29, 2019, the Court entered an Order Clarifying the Scope of Jurisdictional Discovery. That Order disallowed discovery as to general jurisdiction over MC or a conspiracy claim against MC, but allowed discovery as to specific jurisdiction over MC and a claim against MC based on agency. On June 19, 2019, the Special Master who had been appointed to expedite discovery[4] extended these deadlines. Completion of jurisdictional discovery was required by September 20, 2019, Plaintiffs were required to file a Second Amended Complaint by October 7, 2019, and Defendants were required to file a Response within fourteen days thereafter. On August 1, 2019, this Court affirmed those deadlines.

After a stay occasioned by an unsuccessful attempt at mediation, and after a November 22, 2019 hearing, on November 26, 2019 I ordered counsel for the parties to notify me by December 4, 2019 if the Motion was ripe for adjudication. Subsequently counsel for the parties informed me that there was disagreement on the issue of ripeness of the Motion, and I held a hearing on December 30, 2019. In a January 9, 2020 Pretrial Scheduling Order, I ordered that discovery on the issue of personal jurisdiction over Defendant MC be completed by July 1, 2020, and that MC not be required to file an

---

[4] Order of Reference to Special Master entered by this Court on May 14, 2019 (D.I. 124, D.I. 125).

Answer until thereafter. On January 29, Defendants MFI and MFODI filed an Answer to the Amended Complaint. After a March 9, 2020 office conference, on March 11, 2020 I ordered Plaintiffs to file an appropriate Motion to Compel Defendants to respond to personal jurisdiction discovery. On April 14, 2020, Plaintiffs filed a Motion for a Rule to Show Cause and Discovery Sanctions, which Defendants opposed on May 4, 2020. On May 8, 2020, I denied the Motion for Discovery Sanctions, but on May 15, 2020, I ordered the Plaintiffs to file a supplemental submission on MC's Motion to Dismiss for Lack of Personal Jurisdiction by May 18, 2020. On that date, Plaintiffs filed a Supplemental Submission on Mountaire Corporation's Motion to Dismiss for Lack of Personal Jurisdiction. On May 26, 2020, Plaintiffs filed a Second Supplemental Submission on Mountaire Corporation's Motion to Dismiss for Lack of Personal Jurisdiction, and a Second Motion for Discovery Sanctions against Defendants. On June 5, 2020, Defendants filed their Response to Plaintiffs' First and Second Supplemental Submissions on Mountaire Corporation's Motion to Dismiss for Lack of Personal Jurisdiction. On June 8, 2020, Defendants filed their Amended Response to Plaintiffs' First and Second Supplemental Submissions on Mountaire Corporation's Motion to Dismiss for Lack of Personal Jurisdiction. Thus, the issue of personal jurisdiction over MC is now finally ripe for adjudication, more than two years since the Complaint was filed.

## STATUS OF THE CASE

In their Amended Complaint, Plaintiffs assert claims against MC, MFI and MFODI, jointly and severally, for alleged negligence, gross negligence, recklessness, negligence *per se*, nuisance, trespass, and unjust enrichment. These claims stem from Plaintiffs' assertion that Defendants owned, operated and managed a chicken processing plant in Millsboro, Delaware (the "Facility") and caused unsafe quantities of wastewater and sludge generated, treated and/or disposed of at that plant to be released on lands near Plaintiffs' residences. Plaintiffs allege that Defendants, individually and collectively: 1) participated in a material way in owning and operating the Facility and associated real property used for disposal of wastewater and sludge over the relevant time period; 2) through their individual and joint direction, control, and coordination developed, implemented, and carried out the projects, policies and procedures that proximately caused the pollution and damages detailed herein; 3) hired, fired, managed, supervised, and instructed employees, agents and contactors involved in the conduct described herein; 4) promoted and marketed the "Mountaire" brand and products in Delaware; 5) collectively and individually transacted business, solicited business, sold service and products, and entered into contracts causing them to earn revenue directly or indirectly from such business activities conducted in and directed at Delaware; and 6) otherwise engaged in conduct that contributed to the pollution and damages described therein.

5

In the Amended Complaint, Plaintiffs seek remediation of property, groundwater and drinking water wells damaged by Defendants' wastewater and sludge disposal, the creation of a public water system, the implementation of various improvements to the wastewater treatment, storage and disposal facilities, and both compensatory and punitive damages.

With regard to personal jurisdiction over MC, Plaintiffs argue that, although MC is an Arkansas corporation, MC has sufficient contacts with Delaware to support personal jurisdiction over it under both the Delaware long-arm statute and federal Constitutional Due Process protections. As an additional theory of personal jurisdiction, the Amended Complaint alleges that MFODI acted as MC's agent, and that MC as principal is liable for the acts of MFODI as its agent in Delaware.

**STANDARD OF REVIEW**

Upon a motion to dismiss for lack of personal jurisdiction under Superior Court Civil Rule 12(b)(2), Plaintiffs bear the burden of establishing a basis to exercise personal jurisdiction over a nonresident defendant like MC.[5] "In ruling on a Rule 12(b)(2) motion, the Court may consider the pleadings, affidavits, and any discovery of

---

[5] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005); *Boone v. Oy Partek*, 724 A.2d 1150, 1155 (Del. Super. 1997), *aff'd*, 707 A.2d 765 (Del. 1998); *Ali v. Beechcraft Corp.*, 2014 WL 3706619, at *2 (Del. Super. June 30, 2014); *Outokumpu Eng'g Enterprises, Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 727 (Del. Super. 1996).

6

record."[6] "The Court must accept all factual allegations in the complaint as true and view all factual inferences in a light most favorable to the plaintiff[s]."[7]

To withstand the Motion, the Amended Complaint (and Plaintiffs' Supplemental Submissions) must allege facts sufficient to satisfy the requirements of Delaware's long-arm statute, and my exercise of jurisdiction must comport with the requirements of Due Process Clause of the Fourteenth Amendment of the United States Constitution.[8] The Delaware Supreme Court has interpreted the Delaware long-arm statute as permitting Delaware courts to exercise personal jurisdiction over foreign defendants up to the limits imposed by the Due Process Clause of the Fourteenth Amendment.[9] However, the Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the federal Constitutional Due Process analysis.[10] Therefore, to exercise personal jurisdiction over a nonresident Defendant, I must separately determine that I have personal jurisdiction under both state and federal law.[11]

Although I gave the parties until July 1, 2020 to complete jurisdictional discovery,

---

[6] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007); *See Hart Holding Co. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 538-39 (Del. 1991); *Amaysing Techs. Corp. v. CyberAir Communs.*, 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005).

[7] *Tell v. Roman Catholic Bishops of Diocese*, 2010 WL 1691199, at *3 (Del. Super., April 26, 2010). *See Degregorio v. Marriott Intl., Inc.*, 2018 WL 3096627, at *5 (Del. Super. June 20, 2018); *AeroGlobal* 871 A.2d at 437.

[8] *Aeroglobal*, 871 A.2d at 438; *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992); *Boone*, 724 A.2d at 1155; *Ali*, 2014 WL 3706619, at *2; *Outokumpu*, 685 A.2d at 727.

[9] *AeroGlobal*, 871 A.2d at 438; *Hercules*, 611 A.2d at 480.

[10] *Merck & Co., Inc. v. Barr Laboratories, Inc.*, 179 F. Supp. 2d 368, 372 (D. Del. 2002).

[11] *Id.*

7

the parties now agree that there has been sufficient jurisdictional discovery to allow me to adjudicate the Motion. Before jurisdictional discovery, Plaintiffs need only make a *prima facie* showing of jurisdiction in order to survive the Motion. After jurisdictional discovery, as here, Plaintiffs "must allege specific facts supporting its position" and demonstrate my personal jurisdiction over MC by a preponderance of the evidence.[12]

## PERSONAL JURISDICTION

There are two types of personal jurisdiction under Delaware law: specific jurisdiction and general jurisdiction.[13] Specific jurisdiction refers to my power to adjudicate claims arising from MC's Delaware contacts, while general jurisdiction consists of my authority to adjudicate claims unrelated to MC's contacts with Delaware.[14] This Court ruled on May 29, 2019, as to the scope of jurisdictional discovery, that Plaintiffs could only pursue specific jurisdiction over MC based on its contacts with Delaware.[15] For MC's acts to be a basis for jurisdiction, "under Delaware law, it is not sufficient that an act 'relate to' the causes of action alleged; rather, it must be alleged that the act 'set in motion' a 'series of events' that could give rise to the causes

---

[12] *See Reid v. Siniscalchi*, 2018 WL 620475, at *13 (Del. Ch. Jan. 30, 2018) (citing *Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d at 539); *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *2 (Del. Ch. Mar. 4, 2004) (internal quotation marks and footnote omitted).

[13] *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *Outokumpu*, 685 A.2d at 727; *Boone*, 724 A.2d at 1155.

[14] *Id.*

[15] D.I. 148, Stokes, J. May 29, 2019 Order at 8.

8

of action."[16]  The question is "whether a cause of action arises from [MC's] contacts with" Delaware.[17]

The Court allowed Plaintiffs to show two types of contacts: MC's own contacts with Delaware, or MC's contacts with Delaware through MFODI as its agent.[18]

## MC'S Contacts in Delaware

### Delaware Long-Arm Statute

The Delaware long-arm statute[19] permits the exercise of personal jurisdiction over MC as a nonresident Defendant when the claims arose from MC's activities within Delaware.[20]  Specifically, the long-arm statute would allow the exercise of personal jurisdiction when Plaintiffs' claims arise from the in-state acts of MC as a nonresident Defendant who in person or through an agent:

(1) transacts any business or performs any character of work or service in the State;

(2) contracts to supply services or things in the State;

(3) causes tortious injury in the State by an act or omission in the State;

(4) causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

---

[16] *Otto Candies, LLC v. KPMG, LLP*, 2017 WL 3175619 (Del. Super. July 26, 2017) at *24 (footnotes and citations omitted).

[17] *Id.* at *23.

[18] D.I. 148, Stokes, J. May 29, 2019 Order at 9.

[19] 10 *Del. C.* § 3104(c).

[20] *See Kloth v. S. Christian Univ.*, 494 F. Supp. 2d 273, 278 (D. Del. 2007) *aff'd*, 320 F. *App'x* 113 (3d Cir. 2008).

9

(5) has an interest in, uses or possesses real property in the State; or

(6) contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.[21]

Subsections (1), (2) and (3)[22] and (5)[23] and (6)[24] above have been deemed to be specific jurisdiction provisions, leaving subsection (4) as a general jurisdiction provision. The long-arm statute confers personal jurisdiction over MC as a nonresident Defendant if Plaintiffs' claims relate to the particular jurisdictional grounds alleged (*i.e.*, the Plaintiffs' claims arise out of activities undertaken by MC in Delaware).[25]

**Federal Due Process Clause**

As discussed in a line of cases from our Supreme Court, the exercise of personal jurisdiction over nonresident defendants has fundamental Due Process limitations.[26] "For purposes of the Due Process analysis, the relevant inquiry is whether the nonresident defendant maintained sufficient 'minimum contacts' with Delaware such that compelling [the nonresident defendant] to defend [itself] in the State would be

---

[21] 10 *Del. C.* § 3104(c)(1)-(6).
[22] *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1155 (Del. Super. 1997), *aff'd*, 707 A.2d 765 (Del. 1998) (TABLE), *cert. den.*, 118 S. Ct. 2345 (1998); *Dassen v. Boland*, 2011 WL 1225579 at *4 (Del. Super. March 23, 2011); *Tell v. Roman Catholic Bishops of Diocese of Allentown*, 2010 WL 1691199 at *8.
[23] *Otto Candies, LLC v. KPMG, LLP*, 2017 WL 3175619 at *24.
[24] *Stephens v. Bank of Delaware*, 1993 WL 81282 at *3 fn 2 (Del. Super. 1993).
[25] *Outokumpu*, 685 A.2d at 728.
[26] *Salzberg v. Sciabacucchi*, 2020 WL 1280785, at *15 (Del. Supr. March 18, 2020), citing *McDermott v. Lewis*, 531 A.2d 206 (Del. 1987); *Hercules,* 611 A.2d at 480 (citing *LaNuova D & B SpA v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986)).

10

consistent with the traditional notions of fair play and substantial justice."[27] "The Court must determine whether exercising its jurisdiction is consistent with the Due Process Clause of the United States Constitution."[28] "If Plaintiff fails to satisfy this analysis, the exercise of personal jurisdiction over Defendant is improper and the Complaint must be dismissed."[29] The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction when Plaintiffs' claims arise from MC's purposeful contacts with Delaware.[30] For the exercise of personal jurisdiction to be proper under the Due Process Clause, not only must MC have "engaged in sufficient 'minimum contacts' with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice," but Plaintiffs' claims must arise from one or more of the in-state acts giving rise to those contacts.[31]

Thus, the essential element of personal jurisdiction over MC under both the Delaware long-arm statute and the federal Due Process Clause is a relationship between Plaintiffs' claims and MC's purposeful contacts with Delaware.

**Agency**

---

[27] *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quotation and citation omitted).
[28] *Reid v. Siniscalchi*, 2018 WL 620475 at *14; *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018).
[29] *Ohrstrom v. Harris Tr. Co.*, 1998 WL 8849, at *2 (Del. Ch. Jan. 8, 1998).
[30] *See Intellectual Ventures I, LLC v. Ricoh Company, Ltd.*, 67 F. Supp. 3d 656, 659 (D. Del. 2014) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Outokumpu*, 685 A.2d at 731.
[31] *Aeroglobal*, 871 A.2d at 440; *Outokumpu*, 685 A.2d at 728.

11

I may also exercise personal jurisdiction over MC as the corporate parent MFODI, a Delaware corporation, based upon jurisdiction over that subsidiary on the theory that MFODI was acting as agent for MC.[32] To succeed under the agency theory, Plaintiffs must show that "the parent corporation dominates the activities of the subsidiary.... [T]he control must be actual, participatory, and total."[33] To determine whether a sufficient degree of control exists to establish an agency relationship, I consider several factors: the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, arrangements for payment of salaries and expenses, stock ownership, and the process by which each corporation obtains its business.[34] "No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant."[35]

In addition, under standard principles of agency law, MFODI's actions may be imputed to MC.[36] To support personal jurisdiction, MFODI must have acted within the scope of its agency and intended, at least in part, to serve MC's interests,[37] and MC

---

[32] *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991); *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1304 (D. Del. 1990). This theory of personal jurisdiction is distinct from "piercing the corporate veil" or the "alter ego" theory for purposes of liability. *HMG/Courtland Properties, Inc. v. Gray*, 729 A.2d 300, 307 (Del. Ch. 1999); *Sternberg v. O'Neil*, 550 A.2d 1105, 1125–1126 n. 45 (Del. 1988).

[33] *Japan Petroleum Co. (Nigeria) v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978).

[34] *Id.*; *Applied Biosystems, Inc.*, 772 F. Supp. at 1463.

[35] *EBG Holdings LLC v. Vredezicht's Gravenhage*, 2008 WL 4057745, at *11 (Del. Ch.) (quotations omitted).

[36] *Outokumpu*, 685 A.2d at 730.

[37] *Tell v. Roman Catholic Bishops of Diocese of Allentown*, 2010 WL 1691199 at *10 (citing Restatement (Second) of Agency § 228).

must have directed, authorized, or known of MFODI's actions.[38]

## ANALYSIS

### MC's Contacts in Delaware

**Delaware Long-Arm Statute**

On May 12, 2000, Townsend, Inc. executed a Deed to the Facility to MFODI, which continues as the record owner of the Facility.[39] However, MC and MFI both joined MFODI in executing a mortgage recorded with the Sussex County Recorder of Deeds, which secures a $55,000,000 promissory note made jointly and severally by MC, MFODI and MFI payable to the order of Farm Credit Services of Arkansas, a federal association, with its principal place of business in Arkansas ("Lender"). The purpose of this secured loan was to purchase, *inter alia*, the Facility.[40] While it is true that under §3104(c)(5) of the Delaware long arm statute, MC is not strictly the record owner of title to the Facility under the Deed, MC is jointly and severally liable on the loan used to purchase the Facility and the mortgage securing that loan. Thus, if any of the three borrowers defaulted on the loan, including MC, the lender could sue MC alone on the promissory note or foreclose on the Facility. Thus, I think it is fair to say that under §3104(c)(5) MC "has an interest in ... real property in the State;" indeed, a very

---

[38] *Dassen v. Boland*, 2011 WL 1225579, at *6 (Del. Super.); *EBG Holdings*, 2008 WL 4057745, at *11.

[39] *See* Deed (Ex. C to Defendants' Response).

[40] The loan proceeds were also used to purchase a chicken plant in Selbyville, Delaware, as well as the nearby land for wastewater and sludge disposal. D.I. 82, Ex. D.

13

significant interest. MC considered the acquisition so important that it held a special meeting of its board of directors to award Ronald Cameron, MC's Chairman and CEO, a special bonus of $460,000 for negotiating and completing the acquisition of the Facility. I have little doubt that MC would step in to protect its interest by curing a default on the promissory note or preventing foreclosure of the mortgage.

Moreover, under §3104(c)(6) of the long arm statute, I think it is fair to say that MC "contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made." Although MC is not the express guarantor of a loan secured by a mortgage recorded in Delaware, it is a co-borrower under the promissory note and a co-mortgagor under the mortgage. As discussed above, upon a default by MFODI or MFI, MC would essentially act as a surety for the defaulting obligors.

As Defendants correctly point out, however, neither the fact that MC is obligated on a note and mortgage in Delaware, nor the fact that MC negotiated the loan and co-signed the loan documents, is sufficient *in sui* to act as a basis for personal jurisdiction. Although those actions may *relate to* Plaintiffs' claims, there must be more. The actions must be alleged to have set in motion a series of events that could *give rise to* Plaintiffs' claims. However, this does not mean that, at this stage of the proceedings, Plaintiffs must have proved the causal link between Defendants' actions and Plaintiffs' claims; rather, it is enough if, after jurisdictional discovery, Plaintiffs have alleged specific facts supporting

14

jurisdiction over MC by a preponderance of the evidence. I do not consider each contact by MC in isolation. Rather, it is the totality of MC's contacts taken together, and not one or two, that may build a case for personal jurisdiction. While the mere creation of a Delaware business or the acquisition of Delaware real property by a non-resident defendant, standing alone, might be insufficient as a basis for personal jurisdiction,[41] taken together with other actions by Defendants it evidences the first step in a chain of actions that led to Plaintiffs' claims.

Plaintiffs point to other actions in Delaware which they assert set in motion or contributed to the series of events that led to their claims, as follows.

In 2002, a member of the MFODI and MFI Executive Committee presented the wastewater problems at the Facility to the MC Executive Committee, and the discussion concluded with MC recognizing the need to "'fix Delaware' then increase volume."[42] This action by MC relates directly to Plaintiffs' claims.

In 2002, MC knew there were wastewater problems at the Facility. At the September 11, 2002 MC Executive Committee meeting, it was noted that a meeting was scheduled with the EPA "to discuss nitrate levels." An individual "assumed responsibility for wastewater" and was hired by MC as the Director of Engineering and Environmental

---

[41] *Connecticut Gen. Life Ins. Co.*, 2011 WL 5222796, at *2; *Baier v. Upper N.Y. Inv. Co. LLC*, 2018 WL 1791996, at *8-9 (Del. Ch. Apr. 16, 2018); *LVI Grp. Investments, LLC v. NCM Grp. Holdings, LLC*, 2017 WL 3912632, at *5 (Del. Ch. Sept. 7, 2017).
[42] A17-19.

Services for MFODI and MFI.[43] Providing or performing such services in Delaware is a basis for personal jurisdiction under §3104(c)(1) and (2) of the Delaware long arm statute and relates directly to Plaintiffs' claims.

In 2009, MC bought a Millsboro, Delaware home for the President of MFODI and MFI so that he could live in Delaware in his "full-time role as President of poultry operations."[44] MC decided to buy the house and paid for the house. I view this as an interest in, use or possession of Delaware real property as a basis for personal jurisdiction under §3104(c)(5) of the Delaware long arm statute.

MC has funded the Facility through capital investments and guaranties.[45] The latter is a basis for personal jurisdiction under §3104(c)(6) of the Delaware long arm statute.

On June 7, 2000, the MFODI and MFI Executive Committee presented to the MC Executive Committee a $6.355M capital expenditure for the Facility,[46] and on September 26, 2001, the MFODI and MFI Executive Committee presented to the MC Executive Committee $3.8M in "significant capital projects" in Delaware for the next year to increase production.[47]

MC employees regularly fly from Arkansas to Georgetown, Delaware for meetings in Millsboro on a myriad of business meetings on risk management, Facility inspections,

---

[43] A20-23.
[44] D.I. 82, Ex. E.
[45] D.I. 82, Ex. F.
[46] A1-3.
[47] A8-10.

16

EPA meetings, and employee training.[48] Since the Facility was purchased, MC has held fourteen MC Board of Directors and MC Executive Committee meetings in Delaware.[49] I see these actions by MC as the transaction of business in Delaware as a basis for personal jurisdiction under §3104(c)(1) of the Delaware long arm statute.

To summarize, the Delaware long-arm statute confers personal jurisdiction over MC as a nonresident Defendant where MC has taken certain actions enumerated in the statute in Delaware either in person *or through an agent* (see discussion, below). In addition, Plaintiffs' claims must arise out of those actions taken by MC in Delaware; i.e., Plaintiffs' claims must relate to the particular jurisdictional grounds alleged under the statute. In my view, and as discussed above, MC's actions in Delaware are numerous and relate to several enumerated sections of the statute. Plaintiffs' claims arise from one or more of those actions. There is a nexus between Plaintiffs' claims and MC's actions in Delaware. Plaintiffs have demonstrated by a preponderance of the evidence that MC's actions in Delaware set in motion a series of events that could give rise to Plaintiffs' claims. I therefore have personal jurisdiction over MC under the Delaware long-arm statute.

**Federal Due Process Clause**

As discussed above, for purposes of the Due Process Clause of the Fourteenth

---

[48] D.I. 82, Ex. H.
[49] MC's Amend. Ans. Pls. 1st Set of Interrog. on Jurisdiction, January 31, 2020 at p. 5.

Amendment to the Unites States Constitution, the relevant inquiry for me is whether MC maintained sufficient "minimum contacts" with Delaware such that compelling MC to defend itself in Delaware would be consistent with the traditional notions of fair play and substantial justice. The Due Process Clause permits the exercise of personal jurisdiction when Plaintiffs' claims arise from MC's "purposeful" contacts with Delaware. For the exercise of personal jurisdiction to be proper under the Due Process Clause, not only must MC have engaged in sufficient "minimum contacts" with Delaware, but also Plaintiffs' claims must arise from one or more of the in-state actions giving rise to those contacts. The essential element of personal jurisdiction over MC under the Due Process Clause is a relationship between Plaintiffs' claims and MC's purposeful contacts with Delaware.

In my view, MC's contacts with the State of Delaware exceeded minimum contacts; they were numerous and purposeful. As discussed above, Plaintiffs' claims arise from one or more of the Delaware actions giving rise to those contacts. There is a nexus between Plaintiffs' claims and MC's purposeful contacts with Delaware. I therefore have personal jurisdiction over MC under the federal Due Process Clause.

## Agency

Assuming *arguendo* that MC is not subject to personal jurisdiction in its own right, it may nonetheless be subject to personal jurisdiction as principal if its wholly owned subsidiary, MFODI, a Delaware corporation, has taken actions as its agent giving rise to Plaintiffs' claims. However, in no jurisdiction, particularly in Delaware, does a court lightly disregard the separateness of corporate family entities for jurisdictional (or other) purposes. MC purposefully established MFODI and MFI in order to obtain the multiple benefits that derive from the corporate structure, and corporate formalities should not be cavalierly disregarded.

As discussed above, there are two ways to establish personal jurisdiction under the agency theory. First, Plaintiffs can show that MC dominates the activities of MFODI, and that this control is actual, participatory, and total. To determine whether a sufficient degree of control exists to establish an agency relationship, there are several factors to consider, including: the extent of overlap of officers and directors; methods of financing; the division of responsibility for day-to-day management; arrangements for payment of salaries and expenses; stock ownership; and, the process by which each of MC and MFODI obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of factors that is significant.

Second, Plaintiffs can show that MFODI acted within the scope of its agency and intended, at least in part, to serve MC's interests, and that MC directed, authorized, or

19

knew of MFODI's actions.

**Control**

Plaintiffs point to the following evidence to demonstrate that MC "controls" MFODI for purposes of personal jurisdiction.

Since 2000, the overlap of directors between MC and MFODI has been 100%, and the overlap of officers between MC and MFODI has been 75%.[50] MC's board of directors has designated Ronald Cameron, MC's Chairman and President, as the sole proxy of all subsidiaries.[51] Since 2001, MC's stockholders have reviewed and approved the actions of Ronald Cameron, as sole proxy for the subsidiaries, including MFODI, at every annual stockholder meeting of stockholders.[52]

MC makes capital investment decisions for MFODI, including the creation and expansion of resource recovery facilities, the acquisition of additional property, and the creation of wastewater treatment facilities.[53]

MC, not MFODI, manages processing volumes and production at the Facility.[54]

All profits from Delaware operations are remitted by MFODI to MC. MFODI does not retain cash. Rather, cash is remitted to MC, and MC – not MFODI – decides how capital is to be used to fund Delaware operations and capital improvements.[55]

---

[50] A236-255.
[51] A172-179.
[52] A200-219.
[53] A194, A196, A6, A11, A12, A53, A151-52, A156-57, A165.
[54] A41, A197-198, A20-23, A27-29, A39-47, A88-95, A107-109, A121-126, A135-138, A164-167.
[55] A390, A392.

MC obtains loans, secured by the collective assets of all MC subsidiaries, including MFODI, to finance MC's own operations and those of its subsidiaries.[56] Numerous financing documents are signed in Arkansas by MC simultaneously on behalf of MC, MFI and MFODI.[57] MC receives the loan proceeds and distributes them to MFODI in MC's discretion.[58]

MC pays the salary of MFODI executives and management, but these amounts are never repaid by MFODI to MC. Rather, the costs accrue year after year, increasing MFODI's liability to MC for "unpaid management fees" to now over $122 million.[59]

In addition to paying the compensation of MFODI executives and management, the MFODI officer responsible for wastewater operations in Delaware reports directly to the MC board and not to the MFODI board.[60]

Since 2000, MC has held quarterly Executive Committee meetings where MFODI's operations are managed.[61] MFODI only holds perfunctory annual board meetings at MC's headquarters in Arkansas.[62] MFODI does not maintain annual board or quarterly Executive Committee minutes in the ordinary course of its own business.

The MC Executive Committee, sometimes meeting in Delaware, controls and

---

[56] A301-389.
[57] A275-330.
[58] A395.
[59] A392, A396.
[60] A220-235, A4, A17, A20-22, A27, A134, A156, A165.
[61] A194, A197, A20-21, A45, A-88, A156.
[62] A220-235.

funds the training and culture for MFODI through the MFODI Director of Human Resources, who is compensated by MC, not MFODI.[63]

**Direction**

Plaintiffs point to the following evidence to demonstrate that MC "expressly directed" MFODI for purposes of personal jurisdiction.

MC directed MFODI how to address and manage environmental issues of wastewater and sludge.[64] This is reflected in MC Executive Committee meeting minutes. In 2002, the MC Executive Committee reviewed the "Delaware groundwater situation" and conferred about a meeting "with the EPA to discuss nitrate levels" scheduled for a few weeks later.[65] In 2003, the MC Executive Committee discussed "Delaware sludge disposal needs" including completing permitting processes and acquiring more land.[66] In 2011, the MC Executive Committee discussed the "completion of waste water upgrades at Millsboro" planned for 2012.[67] (A59). In September 2017, the MC Executive Committee approved more capital projects including Millsboro wastewater, but they left open the amount of the investment.[68] In December 2017, the MC Executive Committee discussed an "estimated upgrade cost" of $26.5 Million for Millsboro

---

[63] A39-43.

[64] A4, A6, A11, A22, A24, A38, A47-48, A53, A56, A59, A71-72, A76, A89, A100, A151-152, A156-157, A161, A165.

[65] A24.

[66] A27.

[67] A59.

[68] A52.

22

wastewater.[69]   On June 6 and 7, 2018, the MC Executive Committee approved a "Millsboro WW treatment plant" upgrade with a total cost of over $110 Million.[70]

MC directed MFODI to expand operations of the Facility, overtaxing an aged Facility in desperate need of wastewater upgrades.[71] In 2002, the MC Executive Committee discussed "expansion plans being developed in … Millsboro as part of the four year plan," which "concluded with 'fix Delaware' then increase volume."[72] In 2003, the MC Executive Committee discussed alternative plans for growth that all involved adding to the processing at the Millsboro facility.[73] In 2009 and 2010, the MC Executive Committee discussed improving the costs and yields at the Millsboro facility.[74] In 2013, the MC Executive Committee directed MFODI to increase speed and expand production.[75] In 2014, the MC Executive Committee combined plans for more growth with the purchase of a new Delaware headquarters.[76] Finally, in September 2018, despite knowing the Facility's wastewater treatment plant required substantial upgrading, the MC Executive Committee directed MFODI to "max out" capacity and sales.[77]

---

[69] A57.
[70] A165.
[71] A194-199, A188, A1-2, A12, A18, A20-21, A38, A41, A44-45, A47-48, A53, A55, A59, A79, A88, A100, A109, A125-126, A151-152, A164, A166.
[72] A18.
[73] A27.
[74] A30, A47-48, A53.
[75] A88, A197, A198, A109.
[76] A199.
[77] A170.

Defendants reject Plaintiffs' evidence with respect to both control and direction, and assert that MFODI is a separate and distinct entity from MC, that the overlapping officers and directors wear different hats, that MFODI has complete autonomy over its finances, that MFODI's executives and management are independent in their decision making, that all decisions relating to the day-to-day operation and management of the Facility are made solely by MFODI, that MC does not control MFODI's executives by paying their compensation, that no inference should be drawn from MFODI's perfunctory board or Executive Committee meetings and minutes, and that MC does not control the culture of MFODI. Defendants' concluding argument is that MFODI is not a "shell corporation." But this misses the point – a subsidiary may not be a "shell" but can still be controlled by the parent for purposes of establishing personal jurisdiction.

I am struck by the fact that the only piece of evidence relied on by Defendants in their argument on personal jurisdiction, other than Affidavits of interested directors, officers, and management executives, is the Deed to the Facility. There is not one single document – board or Executive Committee meeting agenda, board or Executive Committee meeting minutes, corporate resolution, internal letter, memo or email – that supports Defendants' contention that MFODI acts independently of MC. Further, there is not one single document that refutes Plaintiffs' contention that MC conducts business in Delaware. One would think that, if such documents existed, Defendants would have produced them to support their argument.

24

MC, MFODI and MFI constitute a family-run business run from Arkansas by one person: Mr. Cameron, the Chairman and Chief Executive Officer of all three companies. A corporate structure was put in place to preserve the corporate separation of the parent and its subsidiaries for a variety of legal purposes. However, at least under Delaware law applicable to personal jurisdiction over MC, the way in which the business has been run undermines that corporate structure.

MC as the parent company dominates MFODI in at least four ways: (1) almost complete overlap of MC and MFODI directors and officers; (2) MC finances the operations of MFODI and MFODI sends back the profits to MC; (3) MC provides direction and guidance as to how it wants MFODI managed; and, (4) MC sells chicken and controls the processing at the MFODI Facility to fill its orders. My opinion is that the facts of record establish that MC totally controlled its subsidiaries, including MFODI, to the degree necessary to establish jurisdiction through an agent.

## CONCLUSION

For the reasons set forth above in this Opinion, I deny Defendants' Motion to Dismiss for Lack of Personal Jurisdiction under Superior Court Civil Rule 12(b)(2).

**IT IS SO ORDERED.**

Craig A. Karsnitz

25

cc:    Prothonotary
       David. A. White, Esquire, Special Master